IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

    *Plaintiff.*

    v.

CRAIG JOHNSON,

    *Defendant.*

CRIMINAL NO.:  ELH-15-0542

**MEMORANDUM OPINION**

Defendant Craig Johnson has been charged in a Superseding Indictment (ECF 37) with the offenses of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). ECF 37.  The charges are rooted in the events of March 27, 2015, when officers of the Baltimore City Police Department ("BPD") initiated a stop of defendant's vehicle.  Cocaine was found in the sunroof, and a firearm was subsequently recovered from defendant's residence, pursuant to a search warrant.

Johnson filed a motion to suppress evidence (ECF 20) (the "Motion"), challenging the legality of the vehicle stop.  In addition, Johnson contends that the stop was unlawfully prolonged to await the arrival of a drug detection dog.  Johnson also insists that he did not consent to a search of his SUV, and he maintains that the drug detection dog unlawfully entered the vehicle, where he alerted.  The government opposed the Motion.  ECF 36; *see also* ECF 49.

The Court held evidentiary hearings on April 21, 2016; May 6, 2016; and May 10, 2016.[1] Thereafter, the parties submitted simultaneous post-hearing memoranda. *See* ECF 83 (government's initial post-hearing memorandum); ECF 84 (defendant's initial post-hearing memorandum); ECF 85 (government's post-hearing reply memorandum); ECF 87 (defendant's post-hearing reply memorandum).  Argument on the Motion was heard on August 3, 2016.

For the reasons set forth below, I shall DENY the Motion.

## I.      Factual Summary

Baltimore City Police Officer Jason DiPaola has been a member of the BPD since July 2011.  ECF 58 at 13.[2]  He received 40 hours of "specialized training in street-level narcotics enforcement."  *Id.* at 15.  His duties as a police officer include investigation of narcotics crimes. *Id.* at 14.

Christen Mederios joined the BPD in 2010.  ECF 81 at 33.  In March 2015, he was a patrol officer assigned to the Northwest District Drug Unit in Baltimore City (*id.*), and "[p]rimarily focused on narcotics activity."  *Id.* at 34.  In January 2016, he joined the police department in York, Pennsylvania.  *Id.* at 33.

DiPaola first met Confidential Informant 1562 ("C.I. 1562" or the "C.I.") in 2013, through a fellow BPD officer.  ECF 58 at 16.  C.I. 1562 is registered with the BPD (*id.* at 17-18)[3] and has received payment from the BPD for controlled narcotics purchases and information

---

[1] The transcript of the hearing on April 21, 2016, is docketed at ECF 58.  The transcript of the hearing held on May 6, 2016, is docketed at ECF 81.  The transcript of the hearing held on May 10, 2016, is docketed at ECF 82.

[2] At the hearing, the prosecutor referred to DiPaola as "Detective," although DiPaola did not identify himself as a Detective.  *See, e.g.*, ECF 58 at 12-15.  However, DiPaola never contradicted the reference to "Detective."   In any event, the title is not material to the issues.

[3] Defense Exhibit 2 indicates that the informant has been registered with the BPD since March 31, 2008.

provided to the BPD.  *Id.* at 19.  DiPaola knew from his colleague that the C.I. provided reliable information with respect to drug traffickers and illegal firearms (*id.* at 17, 19) and had also made controlled purchases of narcotics for DiPaola's colleague.  *Id.* at 20.  DiPaola described C.I. 1562 as someone who has "stuck around and . . . continues to work and is very knowledgeable in the narcotics and the handguns in the area."  *Id.* at 54.

DiPaola began working with C.I. 1562 in 2014.  *Id.* at 17.  Between 2014 and March 2015, C.I. 1562 made about 20 controlled purchases of narcotics for DiPaola.  *Id.* at 20.  DiPaola estimated that, prior to March 2015, the information he obtained from C.I. 1562 resulted in about ten arrests involving the seizure of firearms and narcotics.  *Id.*

DiPaola recalled that about one to two weeks prior to March 27, 2015, while he was working with C.I. 1562 on an unrelated matter, the C.I. provided "intel" on a person named "Craig" who lived at 3013 Thorndale Avenue in Baltimore, in an apartment "at the top right," and who drove a white Infinity FX 35 (the "SUV").  ECF 58 at 21-23, 55.  The C.I. reported that "Craig" was selling "ready rock" from his SUV and from "his apartment at Thorndale."  *Id.* at 22; *see also id.* 22-23; at 56.  DiPaola understood the term "ready rock" as a street name for "rock cocaine."  *Id.* at 22.  Moreover, the C.I. told DiPaola that the defendant "keeps . . . the drugs hidden in the sunroof area" of his SUV.  *Id.* at 23.  The C.I. also indicated that he/she had purchased drugs from Craig's vehicle and had Craig's phone number and "could purchase from the apartment."  *Id.* at 24.

The C.I. identified Craig's white Infinity SUV for DiPaola.  ECF 58 at 22-23.  The C.I. also showed DiPaola the apartment building where Craig resided.  *Id.*  DiPaola described 3013 Thorndale as "a low-rise apartment" with four levels and two apartments on each floor.  *Id.*  DiPaola wrote down the license tag number of the SUV and then left.  *Id.* at 23, 55-56.  He

subsequently "ran the license plate" and "it came back to a Craig Johnson" at "a Thorndale

address . . . ." *Id.* at 24.  In addition, the MVA records included a photograph of Johnson, and

DiPaola also obtained "Departmental Databases . . . to get more pictures of [defendant] from

previous arrests." *Id.* at 24-25.

Records of the BPD confirm that DiPaola had contact with the C.I. in February and

March 2015.  But, there is no documentation that the contact pertained to Johnson.  *See* ECF 81

at 24-26; *see also* Defense Exhibit 1 (BPD General Order J-1); Defense Exhibit 2 (C.I.

registration forms).

During the week prior to March 27, 2015, DiPaola conducted surveillance of the SUV,

which was parked in the parking lot of the Thorndale Apartments.  *Id.* at 25-26.  While DiPaola

was in an unmarked police vehicle, he saw "unidentified men and women entering the passenger

side of [Johnson's] vehicle and then immediately exiting it."  *Id.* at 25.  However, because the

SUV has tinted windows (*id.* at 24, 26) it was "[h]ard to see in" the vehicle (*id.* at 26-27) and

DiPaola never saw Johnson.  *Id.* at 26.  Nevertheless, based on DiPaola's training, knowledge,

and experience, he "believed that narcotics transactions were taking place inside [defendant's

vehicle] to be concealed from the street."  *Id.* at 27.  He also described the particular

neighborhood in Baltimore City as "basically an open-air drug market . . . ."  *Id.* at 28.  He said:

"It's just a lot of narcotics being distributed through there and a lot of violence and violent

crimes."  *Id.* at 28.[4]

During the early evening of March 27, 2015, DiPaola was again conducting surveillance

of the SUV and the Thorndale apartment building.  *Id.* at 28.  He was in the front passenger seat

---

[4] The Court is mindful that many law abiding citizens live in communities infected by crime.  Nevertheless, this does not require the Court to ignore that the community in question is plagued by drug dealers.

4

of an unmarked police vehicle; Officer Christen Mederios was the driver; and Officer Muir[5] was in the backseat.  *Id.* at 29; ECF 81 at 36.   As Mederios put it, the officers "were watching the [Thorndale] apartments for drug activity" and "were looking for Mr. Johnson."  ECF 81 at 36. DiPaola had an unobstructed view of the SUV.  ECF 58 at 30.  Both IDiPaola and Mederios saw Johnson exit 3013 Thorndale Avenue and enter the SUV.  ECF 58 at 29; ECF 81 at 36.  DiPaola recognized Johnson from the photos he had seen of him.  ECF 58 at 29.  Neither DiPaola nor the other officers noticed anyone else enter the SUV.  ECF 58 at 33, 75-77; ECF 81 at 53.

The officers began to follow the SUV in their unmarked police vehicle.  ECF 58 at 32; ECF 81 at 37.  They observed the SUV come to an abrupt stop in the middle of the 4800 block of Pimlico Avenue, approximately 150 feet from a traffic light.  ECF 58 at 32; ECF 81 at 37.  At that time, an "unidentified black female exited the back passenger seat, ran behind the car, and sprinted westbound on Oakley Avenue . . . ."  ECF 58 at 32.  DiPaola believed that "some sort of crime had been committed" and "wanted to investigate what was going on . . . ."  *Id.* at 33. Mederios characterized the occurrence as "just really strange," and so the officers "decided to investigate further . . . ."  ECF 81 at 39.  Officer Muir asked Officer Vinias, who was nearby in a marked patrol vehicle, to assist the officers in stopping the SUV.  ECF 58 at 33-34.  Officer Vinias and Officer Williams[6] responded in a marked patrol vehicle.  *Id.* at 34.

At approximately 7:50 p.m., the BPD officers initiated a stop of the SUV at "the corner of Laurel and Virginia Avenue."  *Id.* at 34-35.  The unmarked police vehicle was situated behind the SUV and the marked police car was in front of the SUV, blocking the SUV.  *Id.* at 35; 78-79.

---

[5] I am unable to locate in the record a reference to Muir's first name.

[6] I am unable to locate in the record the first names of officers Muir, Vinias, or Williams.

As Officer Mederios acknowledged, the SUV "was not free to go at that point . . . ."  ECF 81 at 56.

DiPaola approached the driver's side of the vehicle (ECF 58 at 35; ECF 81 at 40) and asked the driver, later identified as the defendant, for his license and registration.  ECF 58 at 35.  DiPaola recalled that Officer Mederios approached the passenger side of the vehicle.  *Id.*  Officer Mederios recalled that both he and Officer DiPaola went to the driver's side of the vehicle and that it was Officer Muir who went to the passenger side of the SUV.  ECF 81 at 57.[7]  Mederios said he stood behind DiPaola "for security."  ECF 81 at 40.  It is undisputed that no weapons were drawn.  ECF 58 at 35; ECF 81 at 56; ECF 82 at 35.

DiPaola promptly explained to Johnson that the SUV was stopped in order "to conduct a CDS investigation . . . ."  ECF 58 at 36.  DiPaola inquired about the female who had "jumped out of the car and began running," and Johnson responded that she is "just a friend."  *Id.* at 36.  Both Johnson and his passenger, Jerry Brown, produced identification.  *Id.*; *see also* ECF ECF 81 at 57.  DiPaola asked Johnson if there "was anything in the car" and defendant answered "no."  ECF 58 at 36; *see also* ECF 81 at 57.  DiPaola did not observe any contraband in plain view.  ECF 58 at 79.

According to DiPaola, he asked Johnson "if we could search the vehicle" (ECF 58 at 36) and Johnson "said yes" (*id.* at 37), without hesitation.  *Id.* at 83.  Although Mederios did not recall "the exact conversation" he specifically recalled "the consent exchange."  ECF 81 at 59.  According to Mederios, DiPaola asked: "'Do you have anything in the vehicle?  Do you mind if we take a look?'"  *Id.*; *see also id.* at 41.  Mederios testified that, in answer to the request to

---

[7] These minor discrepancies do not cause me to discredit the officers' testimony.

search the SUV, Johnson said: "'Go ahead and search.  Go ahead and look.'"  *Id.* at 42; *see also id.* at 59.

Both occupants of the SUV "stepped out of the vehicle.  Walked to the back of the vehicle . . . and they sat on the curb, not in handcuffs . . . ."  ECF 58 at 37.  The "K9 was then requested."  *Id.*

DiPaola testified that he called for the drug detection dog approximately two to three minutes after the vehicle stop.  *Id.* at 37, 101.  Similarly, Mederios testified that the canine unit was requested within "[a] minute or two after the vehicle was stopped."  ECF 81 at 43.  The canine officer responded that "he'd be there in five minutes."  ECF 58 at 37.  DiPaola estimated that the canine unit arrived within 10 minutes of the stop.  *Id.*  According to Mederios, it took "a total of ten minutes" from when the stop was made until the canine arrived.  ECF 81 at 45.

A KGA radio recording was played during Mederios's testimony.  It showed that Mederios called out the tag for the SUV at about 7:48 p.m.  ECF 81 at 46.  The KGA also indicated that a canine unit was requested at 7:50:48.  ECF 81 at 44-45.  At 7:52:33, the canine officer verbally responded to the call, stating:  "'Give me five minutes.'"  *Id.* at 46.

A qualified drug detection dog named Force was brought to the scene by his handler, Detective Scott Reid, a "K9" Officer with the BPD.  ECF 58 at 195.  Reid began work with the BPD in 2007.  He recalled that on March 27, 2015, he received a call for a canine narcotics scan at around "19:55 hours, give or take."  *Id.* at 201-202.  But, he could not recall his time of arrival at the scene.  *Id.* at 202.[8]  When the canine arrived, neither Johnson nor Brown was handcuffed.  ECF 81 at 73.

---

[8] Reid wrote down the time he received the call.  ECF 58 at 202.  But, it is quite surprising that Reid did not know the time of his arrival at the scene.  In many cases, the legality of a canine scan will turn on whether the stop was unlawfully prolonged to await the arrival of

Force is a Belgian Malinois.  ECF 58 at 197.[9]  He is also a certified narcotics detection dog as well as a patrol dog.  *Id.* at 197-98.  A patrol dog is trained in "bite work" as part of "go[ing] after" a suspect.  *Id.* at 198.  According to Reid, a Belgian Malinois is generally more energetic, agile, thinner, and faster than a family member, the German Shepherd.  *Id.* at 210.

Force began to scan the perimeter of the SUV, and DiPaola "stepped back to the back of the car with Mr. Brown and Mr. Johnson."  ECF 58 at 84.  Although DiPaola could see the dog, he "wasn't paying much attention."  *Id.* at 85.  He recalled that he was about three or four feet from the vehicle but facing the curb where Johnson and Brown were seated.  *Id.*  According to DiPaola, the defendant never revoked his consent to the search, nor did he object to the use of the dog.  *Id.* at 39.

According to DiPaola, during the "outside scan of the vehicle," Force "jumped through the window that was left open by Mr. Johnson."  ECF 58 at 38; *see also id.* at 85-86.  Once inside the SUV, the dog alerted at the ceiling in the front of the SUV.  *Id.* at 38.  DiPaola then "reached into the sunroof and recovered a black magnetic box."  The box contained 14 blue Ziplock bags of a white rock substance.  *Id.*

---

the canine, and this, in turn, requires information concerning the time of arrival of the canine. *See, e.g.*, *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).  It is equally surprising that Reid did not know whether Force was on a leash during the perimeter scan.  ECF 58 at 203.

During the hearing, I asked Detective Reid:  "Doesn't it matter sometimes how long it takes you to get there?"  ECF 58 at 202.  He answered, "Yes, Ma'am."  *Id.*  I followed up:  "But you don't know when you got there?"  He answered:  "No, Ma'am, I do not."  *Id.*

It is clear that Reid is quite knowledgeable with respect to the breed of Belgian Malinois in general, and Force in particular.  He was candid and testified credibly.  But, it is difficult to understand how police practice and training do not mandate documentation of information as critical as a canine's arrival time at the scene.

[9] Force's veterinary records incorrectly (and inexplicably) described him as a German Shepherd, rather than a Belgian Malinois.  ECF 58 at 207, 210; *see also* Defense Exhibit 8 (veterinarian records).

Mederios testified that Reid "allowed the dog to enter the vehicle, and the dog hopped into the driver's side window." ECF 81 at 73.   As Mederios described it, "the dog's front paws made contact with the vehicle, pulling the rest of its body through."   *Id.* at 73-74.   Mederios also stated that Reid did not attempt to stop the dog from climbing into the window.   *Id.* at 74.

Reid explained that when he conducts a narcotics perimeter scan of a vehicle, he follows "almost the same routine every time."   ECF 58 at 200.   According to Reid, although Force is "a bite dog" (*id.*), he is not trained to jump into vehicles, nor does he enter a vehicle without a search warrant.   *Id.* at 201.   He said:   "[I]f my dog alerts on the outer part of the car without a search warrant, then that's where I stop.   I don't go inside the car."   ECF 58 at 201.   But, he also said: "Force is trained to go to the odor of narcotics, to find the source of narcotics.   So wherever that may be.   If he has access to it, he is going to get to it."   *Id.*   Reid added that if Force is off leash, "he'll go right to the source."   *Id.* at 226.   And, if Force is on the leash, "he'll try to pull on [Reid] to go with him."   *Id.*

In describing the scan of the SUV, the following testimony of Reid is pertinent.   "Once I gave [Force] the command to sniff, he went around the car.   And basically, he got to the driver's door.   Once he got to the driver's door, there was an open window.   He basically went inside the vehicle, through the driver's open window, and basically started casting high at the sunroof." ECF 58 at 204-205.   Reid added: "That was an indication that something possibly might be there."   *Id.* at 205.   However, Reid denied that he ever prompted or encouraged Force to jump into the open window of the SUV.   *Id.*

Reid elaborated, *id.* at 226:   "What [Force] did is he basically, because of the window being open, he presented himself right through the window and went right to the sunroof." According to Reid, Force "just jumped through the window" (*id.* at 228) and "just leaped" (*id.* at

9

229) when he was about a foot and a half to two feet away from the SUV. *Id.* Reid noted that Force "used the window frame to pull himself in . . . ." *Id.*; *see also id.* at 231 (stating that Force "leaped up into the window and he pulled himself through the window"). Moreover, Reid agreed that the dog's entry into the vehicle was "instantaneous . . . ." *Id.* at 230.

Further, Reid explained: "[A] Malinois has so much drive . . . they don't look at obstacles. They don't look at things that's going to interfere [with] getting their ultimate goal. And their ultimate goal is to find narcotics, and that's when he gets rewarded." *Id.* But, Reid could not recall "[h]ow far into the scan" the dog was when he entered through the window, nor could he recall the part of the SUV where the scan began. *Id.* at 227. However, Reid was certain that he did not start the scan at the driver's window, nor had Force finished the perimeter scan of the vehicle when he entered the SUV through the window. *Id.* at 227.

Reid has performed over 450 canine scans, and this was not the first instance in which Force had entered a vehicle through a window in the course of an exterior vehicle scan. *Id.* at 231. Reid reiterated, *id.*: "If the window's open and he picks up narcotics, he's going to go through the window." Notably, Reid was asked: "And you know [Force] has this propensity?" *Id.* Reid responded: "Oh, absolutely." *Id.* Reid did not remember whether or not Force was on a leash during the scan. *Id.* at 203. Nor could DiPaola recall if Force was leashed. *Id.* at 39. Mederios thought that the dog was leashed as it walked around the SUV, but that the dog's handler "might have let it off when [the dog] went into the vehicle . . . ." ECF 81 at 73.

With respect to DiPaola's decision to request a canine unit, DiPaola acknowledged that, because Johnson had consented to the search, he did not need a drug detection dog to conduct a scan. ECF 58 at 82. But, he stated: "I wanted a dog." ECF 58 at 82. He explained that, notwithstanding the defendant's consent to the search of the SUV, the canine unit would "make

[his] case stronger." *Id.* at 81.[10]  DiPaola also said that, if the canine had not been called, he would have searched the SUV, including the sunroof area of the vehicle, because Johnson had consented to the vehicle search and the C.I. told DiPaola that the defendant "stashed" his drugs in the sunroof of the SUV. *Id.* at 39-40.

After DiPaola recovered the drugs from the SUV, he placed both Johnson and Brown under arrest, handcuffed them, escorted them to the police vehicle, and advised them of their "Miranda rights." ECF 58 at 40; *see also id.* at 42.  DiPaola recited the warnings from memory. *Id.* at 41.  Both men "verbally agreed that they understood." *Id.* at 40, 42.

At the scene, DiPaola told Johnson that he was going to obtain a search and seizure warrant for defendant's apartment and asked defendant if he had any contraband in his apartment. *Id.* at 42-43.  Johnson disclosed that "he had a gun in his apartment" (ECF 58 at 42-43), located in the closet in his bedroom. *Id.* at 44.

At the police station, DiPaola again advised the defendant of his *Miranda* rights, but this time he used a form (*id.* at 41, 43, 44-45), and read the rights "verbatim" from the *Miranda* form. *Id.* at 46.  The defendant again indicated that he understood his rights. *Id.*  DiPaola also explained a consent to search form to Johnson with respect to Johnson's residence, although he did not read that form verbatim. *Id.* at 49.  Nevertheless, Johnson read the form for himself, indicated that he understood the form, and signed the consent to search form at 8:55 p.m. *Id.* at 49-50; *see* Government Exhibit 1.  However, Johnson did not sign the *Miranda* form. *See* Government Exhibit 3.  DiPaola explained that he "made a mistake," because he did not ask the defendant to sign the *Miranda* form. *Id.* at 45.  Johnson reiterated that he had a gun in his

---

[10] DiPaola's conduct in calling for the drug dog, despite a consent to search, is consistent with his later conduct, when he obtained Johnson's written consent to search Johnson's residence but nonetheless proceeded to obtain a search warrant.

apartment.  *Id.* at 47.  According to DiPaola, Johnson did not want his son to be scared by the search (*id.* at 47), and so he gave the police the key to his apartment.  *Id.* at 44-45.[11]

The defendant also testified.  Johnson, who was 42 years of age at the time of the hearing, is a high school graduate and is able to read, write, and understand English.  ECF 58 at 166.

Johnson recalled that he was stopped by the BPD on the evening of March 27, 2015, "on Laurel and Virginia at the stop sign."  ECF 58 at 171.  One police vehicle was "a regular" police vehicle and the other was an unmarked vehicle.  *Id.*  Once stopped, "there was no way for [him] to get out and evade[.]"  *Id.*

According to Johnson, a police officer – not DiPaola – approached the driver's side.  ECF 58 at 172.  Johnson then "cracked" his window and asked, "'What's the problem, Officer?'"  *Id.*  The officer responded, "'Nothin.  Just sit tight.'"  *Id.*; *see also id.* at 174.  Thereafter, Johnson provided his license and registration to the officer.  Johnson testified that he said to the police officer: "'What are you, like the auto task force?'"  *Id.* at 172; *see also id.* at 191.  Johnson was again told to "'. . . sit tight. Wait for [the] K9 unit.'"  *Id.* at 172.  Johnson stated that he continued to talk to his passenger and used his cell phone as he sat in his SUV.  *Id.*  Then, he again asked the police officer what was going on, and the officer indicated that they were waiting for the arrival of the canine unit.  *Id.* at 174.  According to Johnson, he told the officer: "'I didn't give you consent to put the K9 in my car.'"  *Id.* at 174; *see also id.* at 191.

Johnson also asserted that the police asked him if he had any weapons in the SUV.  *Id.* at 191.  But, he denied that he was asked for consent to search his SUV.  *Id.* at 191-192.  And, Johnson denied that he ever gave consent to the police to search his vehicle.  *Id.* at 175.  Moreover, Johnson indicated that he was "well aware" of right to refuse consent to search his

---

[11] The BPD obtained a search warrant for Johnson's apartment, but used Johnson's key to gain entry.

vehicle. *Id.*   Indeed, he indicated that he had previously said no to such a request. *Id.*   And, knowing that he had drugs in the SUV, Johnson claimed he would not have agreed to a search of his vehicle. *Id.*

Some "10 or 15 minutes went by," and Johnson and Brown were placed on the curb, "and when the K9 unit showed, they went from there."   ECF 58 at 172.   Johnson stated that the dog "just basically was running in and out of the car," through the SUV's "hatchback."   ECF 58 at 173.   However, Johnson denied that the dog ever leaped through the window of his SUV. *Id.* at 178.

Notably, Johnson testified that DiPaola "knew exactly where it [i.e. the drugs] was at in the sunroof.   He went straight to it, pulled the sunroof cover back, stuck his hand in there, and took the box off."   ECF 58 at 174.   Johnson claimed that when DiPaola found the narcotics in the sunroof, he said, "'Bingo.'" *Id.* at 176.

Defendant admitted that the drugs found in the SUV belonged to him and that he had intended to sell them.   ECF 58 at 170, 185.   He also took responsibility for the firearm that was later recovered from his residence. *Id.* at 170-171.   But, he denied that he conducted drug transactions in his SUV. *Id.* at 185.   When the Court then asked why the drugs were in the vehicle (*id.* at 185), Johnson said:   "'I forgot they was in the [sic] there.   I left' em in there.'" *Id.* at 186.   This testimony conflicted with Johnson's earlier testimony, in which he said he would not have consented to a search, knowing he had drugs in the SUV. *See id.* at 175.

Johnson acknowledged that DiPaola advised him of his *Miranda* rights at the scene.   ECF 58 at 176; 178-79; 186.   Although Johnson acknowledged that he consented to the search of his residence, he claimed he did so only out of a concern for his son, who was at home, and to avoid threatened police searches of other locations, such as his mother's residence.   ECF 58 at 176-77.

13

Johnson also maintained that he was "overwhelmed" when he signed the consent to search form for his residence. *Id.* at 188. And, he denied that he voluntarily gave the key to his residence to the police. Rather, he claimed the police took the key from him. *Id.* at 189.

The defense also called Johnson's front seat passenger, Jerry Brown. According to Brown, Johnson was pulled over by an unmarked police car. ECF 82 at 34. There was more than one police car at the scene, and the SUV was "boxed" in. *Id.* at 34. Brown conceded that no guns were drawn by the officers when they approached the vehicle. *Id.* at 35.

According to Brown, during the exchange between the police officer and Johnson, the driver's side window of the SUV was down. ECF 82 at 15. Brown recalled that the officer stated that he had information that "there was something in the car." *Id.* at 16. Thereafter, he and Johnson were "forced out of the car . . . ." *Id.* Brown never heard the officer ask Johnson for permission to search the SUV, nor did he ever hear Johnson consent to such a search. *Id.* at 17. Brown also noted that he and Johnson were removed from the SUV about five to ten minutes after the stop. *Id.* at 18.

On cross-examination, Brown was asked whether he ever heard Mr. Johnson affirmatively tell the police they were not allowed to search his car. He answered: "I can't remember." *Id.* at 37. Of import here, Brown repeatedly claimed that he never discussed Johnson's case with Johnson. *Id.* at 39-40. The government then played a portion of a recorded phone call that occurred when Johnson was detained as a result of his arrest. *Id.* at 61.[12] Brown confirmed the identity of his own voice and that of the defendant. *Id.* The call, which was used for impeachment purposes, unequivocally established that, contrary to Brown's repeated

---

[12] Johnson was subsequently released from incarceration. He was not in custody at the time of the Motion hearings.

assertions, he in fact discussed Johnson's case with Johnson.   In my view, the impeachment seriously undermined Brown's credibility.

Andre Falco Jimenez testified as an expert witness for the defense on the use of drug detection dogs generally, and in particular the German Shepherd.   ECF 58 at 129.   Inexplicably, Force's veterinary records erroneously described Force as a German Shepherd, and much of Jimenez's initial testimony was predicated on his views as to the abilities of that breed.   *Id.* at 141, 151-52.   As a result, much of Jiminez's initial testimony was not particularly useful, because Force is a Belgian Malinois, not a German Shepherd, and Jimenez had no familiarity with Force.   *Id.* at 147-148.

According to Jimenez, narcotics dogs generally are not trained to go through open car windows (*id.* at 137), because this could damage the vehicle (*id.* at 139), and could be dangerous to the dog.   *Id.* at 140.   But, he acknowledged that patrol dogs enter "through the windows all the time."   *Id.* at 137.   And, as noted, Force is trained as both a drug detection dog *and* a patrol dog.

Believing (erroneously) that Force is a German Shepherd, Jiminez opined that there is "Zero" probability that a drug detection dog of Force's breed, age (5 and a half), and weight (80 pounds), "trained only in drug detection," would jump through an open window during a perimeter vehicle scan, "without any warning, encouragement, or assistance from its handler[.]" *Id.* at 142.   In his view, if the dog went through the window, it had to "have been commanded, lifted, and motivated to go through the window . . . .   It wouldn't do it on its own."   ECF 58 at 145; *see also id.* at 144, 151.   Jimenez maintained that the dog "can crawl through the window. He can be lifted and pushed through the window.   He can get through the window, but he cannot jump through the window without touching it."   *Id.* at 150.

As indicated, the opinion testimony recited above was offered when the expert witness, Jimenez, thought Force is a German Shepherd. *See*, *e.g.*, ECF 58 at 151-52. During the hearing, it was established that Force is a Belgian Malinois, and not a German Shepherd. And, Jiminez acknowledged that a Belgian Malinois is "more of an agile dog." *Id.* at 155.

After it was established that Force is a Belgian Malinois, Jimenez was recalled. He testified by telephone on the second day of the hearing. ECF 81 at 85.

Jimenez opined that it would not be possible, even for a Belgian Malinois, suddenly to jump through the window of an SUV, without warning. ECF 81 at 88. Notably, Jimenez stated, *Id.* at 89: "The Shepherd would not make it through that window, but a Belgian Malinois could, but it doesn't mean that it would do it easily . . . it would be difficult." He added that "there would have to be a preparation, a sighting of the target, and most likely crawling through the window, not, you know, clearing the window and going through it without touching." *Id.* Rather, "[t]he dog would have to crawl through the window." *Id.* Jimenez continued: "[I]t literally would have to put its paws on the bottom part of the window and then pull itself through. It would not jump through the window like maybe a younger dog may be able to do with a running start, but the handler would see – the handler could not miss the dog trying to do this." *Id.* at 89-90.

Additional facts are included in the Discussion.

## II.   Discussion

### A.  Probable Cause and Reasonable Suspicion

The government maintains that the police had probable cause to stop Johnson's SUV, to arrest him, and to search his vehicle. ECF 83 at 19-24. *See*, *e.g.*, *United States v. Ross*, 456 U.S. 798, 799-800 (1982) (search); *Herring v. United States*, 555 U.S. 135, 136 (2009) (arrest).

Alternatively, the government contends that, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the police had reasonable, articulable suspicion to stop the SUV and to conduct a narcotics investigation, including use of a drug detection dog. *Id.* at 24-34.

The defense vigorously disagrees with the government's contentions. ECF 87 at 1-2. As to probable cause, it notes, *inter alia*, that if DiPaola believed he had probable cause, then he had sufficient time before March 27, 2015, to obtain an arrest warrant and a search warrant. *Id.* at 2. Further, the defense maintains that the police lacked reasonable suspicion to stop the SUV. ECF 84 at 3. Among other things, Johnson points to "a temporal gap of weeks" between when the C.I. provided information to DiPaola and the date of the vehicular stop (*id.* at 3) and asserts: "The temporal gap rendered the informant's tip and the officer's surveillance both stale for the purposes of conducting the *Terry* stop of Mr. Johnson and his vehicle." ECF 87 at 10. Insisting that reasonable suspicion does not last "in perpetuity," Johnson argues: "The Court should not countenance such an overreach of police power." *Id.* at 11. Moreover, Johnson maintains that, even if the BPD had reasonable suspicion to justify the initial stop of the SUV, the police unlawfully prolonged the stop, because their suspicions had been "dispelled by the officer's car-side investigation early in the stop." *Id.* at 12; *see also* ECF 84 at 3.

### 1.   Probable Cause

When a police officer stops a motor vehicle and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment. *See, e.g., Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). The Fourth Amendment protects against unreasonable searches and seizures. *See*

*Utah v. Strieff*, ____ U.S. ____, 136 S. Ct. 2056, 2060 (2016); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).  Therefore, the vehicular stop must be reasonable under the circumstances. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016).

A vehicular stop may be founded on probable cause.  *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009).  The concept of probable cause is not subject to a precise definition, however. *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010).  As the Supreme Court said in *Ornales v. United States*, 517 U.S. 690, 696 (1996), probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found."  The assessment of probable cause is based on the totality of the relevant circumstances, "rather than on the technical or rigid demands of a formulaic legal test."  *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011).

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.  We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

*See also Illinois v. Gates*, 462 U.S. 213 (1983); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

18

I am not persuaded that the police had probable cause to stop the SUV.  As discussed, the C.I. was clearly reliable, and DiPaola had corroborated some of the information provided by the C.I., such as registration of the SUV to Johnson and surveillance of what DiPaola reasonably believed were drug transactions conducted in the SUV.  But, DiPaola was unable to see through the tinted windows of the SUV, and thus never confirmed actual drug transactions, nor was he able to determine if Johnson was in his SUV during those suspected drug transactions.

Although the government's assertion of probable cause is not specious, I believe the quantum of information available to the BPD fell short of the probable cause standard. Nevertheless, as discussed below, I am readily satisfied that the BPD had reasonable, articulable suspicion to stop the SUV on the evening of August 27, 2015.

### 2. *Terry* Principles

"'The ultimate touchstone of the Fourth Amendment is reasonableness.'"  *Riley v. California*, _____ U.S. _____, 134 S. Ct. 2473, 2482 (2014) (citation and some quotation marks omitted); *see Maryland v. Wilson,* 519 U.S. 408, 411 (1997); *Ohio v. Robinette*, 519 U.S. 33, 38 (1996); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013).  The "test of reasonableness under the Fourth Amendment is an objective one."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  The Supreme Court explained in *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam):  "Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'"  (Quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989).

Warrantless searches and seizures are *per se* unreasonable, subject only to a few well established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Kentucky v. King*, 563 U.S. 452, 459-60 (2011).   What has become known as the "*Terry* stop and frisk" is one of the limited exceptions to the warrant requirement.   *Terry v. Ohio*, 392 U.S. 1 (1968).   The seminal case of *Terry v. Ohio* and its progeny permit a police officer to stop and detain an individual, without probable cause, and without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as the police officer has "specific and articulable facts which, taken together with rational inferences from those facts," create reasonable suspicion that the person has been or is about to engage in criminal activity.   *Terry*, 392 U.S. at 21; *see also id*. at 30; *Sokolow*, 490 U.S. at 7 ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause") (citation omitted).

The purpose of a *Terry* stop is investigative—to verify or to dispel the officer's suspicion surrounding the suspect.   *Terry*, 392 U.S. at 22-23, 30.   But, the stop must be brief, and it must be "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."   *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see Sokolow*, 490 U.S at 7; *United States v. Arvizu*, 434 U.S. 266, 273 (2002); *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011).

Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians."   *Ornelas*, 517 U.S. at 695 (internal quotation marks omitted).   The reasonable suspicion standard is not onerous.   *See*, *e.g.*, *United States v. Glover*, 662 F.3d 694, 698-700 (4th Cir. 2011).   Notably, it "is a less demanding standard than probable cause and requires a showing considerably less than

preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  However, as noted, the police must have "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ."  *Ornelas*, 517 U.S. at 696; *see Navarette v. California*, ____ U.S. ____, 134 S. Ct. 1683, 1687 (2014); *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016); *United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *Massenburg*, 654 F.3d at 486; *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009), *cert. denied*, 562 U.S. 1273 (2011).

In other words, there must be some minimal level of objective justification for making the stop.  *See Wardlow*, 528 U.S. at 123; *Gardner*, 823 F.3d at 799; *United States v. Lawing,* 703 F. 3d 229, 236 (4th Cir. 2012), *cert. denied*, 133 St. Ct. 1851 (2013); *Ortiz*, 669 F.3d at 444; *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000).  Therefore, an officer conducting a *Terry* stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity."  *Terry*, 392 U.S. at 27; *see also Alabama v. White*, 496 U.S. 325, 329-30 (1990); *Bumpers*, 705 F.3d at 171.[13]

To be sure, the question of reasonable, articulable suspicion is sometimes elusive.  Indeed, the Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the term articulable suspicion.  *Ornelas*, 517 U.S. at 699-700.  In *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 329 (2011), the Fourth Circuit reiterated that the concept of reasonable, articulable suspicion "'is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails commonsense, nontechnical conceptions that deal with factual and practical considerations of everyday life.'"  (Citation omitted).

---

[13] Because the reasonable suspicion standard is an objective one, the officer's subjective state of mind is not considered.  *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

Reasonable suspicion is determined by examining the totality of the circumstances. *See Wardlow*, 528 U.S. at 123; *Sokolow*, 490 U.S. at 7-8. "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013). And, in assessing reasonable suspicion, courts must "give due weight to commonsense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also United States v. Sowards*, 690 F.3d 585, 587-88 (4th Cir. 2012); *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *United States v. Branch*, 537 F.3d 328, 336-37 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009). Although a particular act may, by itself, be innocent, a series of such acts, taken together, can give rise to reasonable suspicion. *Arvizu*, 534 U.S. at 274; *see also Palmer*, 820 F.3d 652; *Williams*, 808 F.3d at 246; *George*, 732 F.3d at 300; *United States v. McCoy*, 513 F.3d 405, 413-14 (4th Cir. 2008). In other words, the court may evaluate "cumulative information" available to the police officer. *United States v. McBride*, 676 F.3d 385, 392 (4th Cir. 2012).

A traffic stop is "analogous to a so-called 'Terry stop' . . . ." *Berkemer v. McCarthy*, 468 U.S. 420, 439 (1984); *see Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609 (2015); *Knowles v. Iowa*, 525 U.S. 113, 117 (1998); *Williams*, 808 F.3d at 245. Thus, the court assesses the constitutionality of a traffic stop under the two-prong standard articulated in *Terry v. Ohio*, *supra*. *See Arizona v. Johnson*, 555 U.S. at 330-31; *Palmer*, 820 F.3d at 648; *Williams*, 808 F.3d at 245; *United States v. Guijan-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).

Under the dual inquiry, the court first examines "whether the officer's action was justified at its inception and [second] whether it was reasonably related in scope to the

circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682; *see Palmer*, 820 F.3d at 648; *Williams*, 808 F.3d at 245; *Guijon-Ortiz*, 660 F.3d at 764; *Digiovanni*, 650 F.3d at 506.  The investigative seizure or stop must be limited both in scope and duration. *Digiovanni*, 650 F.3d at 507; *see also Florida v. Royer,* 460 U.S. 491, 500 (1983) (plurality opinion); *Williams*, 808 F.3d at 245; *Guijon-Ortiz*, 660 F.3d at 764; *Branch*, 537 F.3d at 337. "Generally . . . an officer's focus must remain on the bases for the traffic stop. . . ." *Palmer*, 820 F.3d at 649.

This case did not involve a routine traffic stop, in that the stop was not based on a suspected motor vehicle infraction, such as speeding.  Rather, it was an investigative stop based on a suspected narcotics violation.  Because a motor vehicle was stopped, albeit not for a traffic violation, such a stop is nonetheless described as a traffic stop.  *See, e.g.*, *Gardner*, 823 F.3d at 797-98.[14]  "[I]t is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband and they may briefly detain and investigate such a vehicle and its occupants." *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004); *see also Sharpe*, 470 U.S. at 687-88 (upholding 20-minute investigatory stop of vehicle based on circumstances indicative of drug trafficking).  *Terry's* dual inquiry analysis applies.

The first prong of the inquiry is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. at 327; *see Palmer*, 820 F.3d at 649.  "*Terry's* second prong restricts the range of permissible actions that a police officer may take after initiating a traffic stop." *Palmer*, 820 F.3d at 649.  The detention of a person during a traffic stop "must be temporary and last no

---

[14]  In *Gardner*, the police initiated a vehicle stop based on information from a reliable informant that the defendant was a convicted felon in possession of a firearm.  The Court referred to the stop as a "traffic stop."  *See, e.g.*, *id.*, at 798.  But, this case does not involve an ordinary traffic stop, in that the stop was not predicated on a traffic violation.

longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500. In other words, the police officer "must act reasonably, that is, he must diligently pursue the investigation of the justification for the stop (usually a traffic infraction) . . . to avoid running afoul of the duration component of *Terry*'s second prong." *Digiovanni*, 650 F.3d at 509.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. . . . A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005) (internal citation omitted). In the context of an ordinary traffic stop, in order to prolong it "'beyond the scope of a routine traffic stop,' an officer 'must possess a justification for doing so other than the initial traffic violation that prompted the stop . . . .' This requires 'either the driver's consent or a 'reasonable suspicion that [other] illegal activity is afoot.'" *Guijon-Ortiz*, 660 F.3d at 764 (citations omitted); *see also Ortiz*, 669 F.3d at 444 ("Any detention longer than reasonably necessary to accomplish the purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity."). And, the officer must employ "'the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Digiovanni*, 650 F.3d at 507 (citation omitted). However, this does not mean "the least intrusive means conceivable." *Palmer*, 820 F.3d at 649.

In the recent case of *Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609, 1614 (2015), the Supreme Court said:

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" – to address the traffic violation that warranted the stop, *Caballes*, 543 U.S. , at 407, 125 S.Ct. 834 and attend to related safety concerns, *infra*, at 1619-1620. See also *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L.Ed. 2d 605 (1985); *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L.Ed 2d 229 (1983) (plurality opinion)

("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid*. See also *Caballes*, 543 U.S. at 407, 125 S.Ct. 834. Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed. See *Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

The *Rodriguez* Court also said, 135 S. Ct. at 1612:

We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. [*Illinois v. Caballes*, 543 U.S. 405] at 407, 125 S. Ct. 834 (2005)] The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

As the Fourth Circuit made clear in *Williams*, 808 F.3d at 246, the *Rodriguez* decision, 135 S. Ct. 1609, forecloses even a *de minimis* extension of a routine traffic stop, *in the absence of reasonable suspicion of criminal activity*. Conversely, a traffic stop may be extended if there is reasonable, articulable suspicion to do so. *Palmer*, 820 F.3d at 650.

Lawful duration is not subject to mathematical precision. *Branch*, 537 F.3d at 336. Analyzing the scope and duration components requires "highly fact-specific inquiries. . . ." *Guijon-Ortiz,* 660 F.3d at 764. *See*, *e.g.*, *United States v. Harvey*, 901 F. Supp. 2d 681, 686 (N.D. W. Va. 2012). The court must evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it is necessary to detain the defendant." *Sharpe*, 470 U.S. at 686; *see also Digiovanni*, 650 F.3d at 509; *Guijon-Ortiz*, 660 F.3d at 764, 766.

The calculus for the determination of whether the stop here was founded on reasonable suspicion, and whether or when reasonable suspicion was dispelled, begins with C.I. 1562. Of

import here, the information obtained by DiPaola from the C.I. makes clear that the vehicle stop in this case was not a routine traffic stop.

### 3.   The Confidential Informant

The Fourth Circuit has recently reiterated that, "when an investigative stop is based on unverified information provided by a known informant, a tip of this nature 'may alone justify a reasonable suspicion of criminal activity.'" *United States v. Gardner*, 823 F. 3d at 799 (quoting *Singh*, 363 F.3d at 355). And, "when police obtain information corroborating such a tip [from a known informant], this circumstance adds significant support for a finding of reasonable suspicion." *Gardner*, 823 F.3d at 800. Moreover, police need not verify "every detail provided by a tipster" in order to find reasonable suspicion. *Id.* (citing *White*, 496 U.S. at 331-32).

Courts have generally distinguished cases involving tips from known individuals and those involving anonymous tipsters. *See*, *e.g.*, *United States v. Bryant*, ___ Fed. App'x ____, 2016 WL 3902642 (4th Cir. July 19, 2016); *see also United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007) ("Another – and even more significant- indicator that an anonymous informant is reliable is her disclosure of information that would enable authorities to identify her if they deem it necessary to do so."), *cert. denied*, 550 U.S. 927 (2007); *Christmas*, 222 F.3d at 144 (distinguishing face-to-face informant from anonymous tipster, in part because face-to-face informant can be identified and held accountable for information). When a tipster or an informant is known, his "reputation can be assessed" and he "can be held responsible if [his] allegations turn out to be fabricated . . . ." *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *see Christmas*, 222 F.3d at 144 (stating that an informant who reports tips face-to-face is "more

trustworthy and reliable than [an] anonymous tip" because law enforcement can hold the informant accountable for false statements).[15]

*Griffin*, *supra,* 589 F.3d 148, is informative.  That case involved a police officer's face-to-face encounter with an informant.  The Court identified several factors relevant to whether an informant's tip supports reasonable suspicion.  These included whether "the officer had the opportunity to observe the informant's credibility and demeanor"; "whether the officer could later hold the informant accountable for making false accusations"; and "whether the informant reported to the police in public, exposing himself to retaliation from the suspect and increasing the informant's reliability."  Less scrutiny is generally required as to the basis of knowledge for an informant whose honesty has not been questioned.  *Id.  See also, e.g.*, *Lawing,* 703 F.3d at 236 (reasonable suspicion existed where confidential informant "had relayed information to the police in a face-to-face setting thereby affording them the clear ability to judge his credibility and corroborate the information he provided."); *Perkins*, 363 F.3d at 323 (in a face-to-face encounter with an informant, police can "judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion").

The recent case of *United States v. Gardner*, *supra*, 823 F.3d 793, is also noteworthy.  There, officers received a tip from a known informant that a convicted felon driving a white Lincoln Town Car could be found at a particular location in possession of a gun.  Thereafter, the officers "initiated a traffic stop."  *Id.* at 798.  Notably, the Court said, *id.* at 800:  "This tip alone may have supported a finding of reasonable suspicion.[1]" (citing *Singh*, 363 F.3d at 355).  But,

---

[15] To be sure, even an anonymous tip may, under the totality of circumstances, provide reasonable suspicion to justify an investigatory stop if the police corroborate some "significant aspects" of the tip or there is sufficient indicia of reliability.  *White*, 496 U.S. at 332; *see Elston*, 479 F.3d at 318; *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004), *cert. denied*, 543 U.S. 1056 (2005).

the Court noted that the officers had also corroborated some of the information provided by the informant, such as the presence of the white Town Car at the described location and the defendant's ownership of the vehicle. *Id.* However, the police did not confirm an important element of the offense – that the defendant was actually a convicted felon. Yet, that omission was not fatal; the Court nonetheless concluded that the stop was supported by reasonable suspicion. *Id.* at 801. Moreover, it found no merit to the claim that the informant was unreliable because she was the defendant's former girlfriend or because the police had paid her for the tip. *Id.* at 800 n.1.

### 4.  The stop was based on reasonable suspicion

This case does not involve an unknown informant, or an unverified tip from a known informant. As the factual presentation reveals, C.I. 1562 was a reliable informant (ECF 58 at 19) who was well known to the BPD. He/she had the proverbial "proven track record" in the course of several years of interaction with the BPD, including with Officer DiPaola, who first began to work with the C.I. in 2014. As indicated, the C.I. conducted approximately twenty "controlled buys" for DiPaola prior to March 27, 2015. ECF 58 at 20. Moreover, prior to March 2015, the C.I. provided DiPaola with information that led to about ten arrests involving drugs or guns. *Id.*

In March 2015, the C.I. was working with DiPaola on a matter unrelated to this case. ECF 58 at 210-21. About a week or two before March 27, 2015, the C.I. disclosed to DiPaola that an individual known as "Craig" sold narcotics from his Infinity. ECF 58 at 22. The C.I. also told DiPaola that he/she had purchased cocaine personally from Johnson at his vehicle. *Id.* at 22-24. The C.I. pointed out defendant's SUV and residence to DiPaola (*id.* at 21-22) and provided specific information as to the location of the drugs in the sunroof of defendant's SUV. *Id.* at 23.

Thereafter, DiPaola verified that a subject named Craig Johnson had a vehicle registered to him that matched the description of the SUV identified by the informant, at the address that the C.I. had disclosed.   In addition, the detective observed the defendant at the particular apartment building on Thorndale Road.  ECF 58 at 24.  Significantly, prior to March 27, 2015, DiPaola conducted surveillance of the SUV, in a high crime area of Baltimore, and, based on his training and experience, the conduct was consistent with drug transactions in the SUV.  *Id.* at 26-28; 90.  To be sure, DiPaola never saw Johnson through the tinted windows of the SUV.  *Id.* at 26.   Nor did he see any drugs actually change hands.   However, DiPaola described his observation of multiple persons quickly entering and exiting the SUV, which he recognized as conduct consistent with drug transactions.

The Fourth Circuit has recognized that "it is entirely appropriate for courts to credit the practical experience of officers who observe on a daily basis what transpires on the street." *Branch*, 537 F.3d at 336-337 (internal quotation marks omitted).  I credit DiPaola's assessment of his surveillance of the SUV.

On the date of arrest, DiPaola saw Johnson exit his apartment building and enter the SUV.  ECF 58 at 28-31.  The police officers were attempting to conduct additional surveillance of Johnson and followed the SUV.  At that time, they saw a woman suddenly exit the SUV in the middle of the street and run across the street.  That incident certainly could have been completely benign.  But, given what DiPaola already knew, it was reasonable for him to suspect a crime. ECF 58 at 33.  *See Branch*, 537 F.3d at 336 ("[C]ontext matters:  actions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances."); *see also Mason*, 628 F.3d at 129-30.  Under the totality

of the circumstances, the BPD had reasonable suspicion to stop the SUV to investigate Johnson's suspected drug dealing.

The defense insists that DiPaola's earlier surveillance of suspected drug transactions in the SUV had become stale by the time of the stop.  Johnson complains that, under the government's analysis, "reasonable suspicion has no shelf-life—that it never expires, that an officer can bank it until needed."  ECF 84 at 13.  Staleness has no traction here.

The information was provided to DiPaola by the C.I. only about one or two weeks before the vehicular stop.  And, about one week prior to the arrest, DiPaola made observations of unknown persons quickly entering and exiting the passenger side of defendant's SUV, consistent with drug transactions and corroborative of the information provided by the reliable C.I. Johnson's staleness argument collapses under the weight of these facts.  Indeed, many courts have recognized that drug distribution is an ongoing, continuing criminal activity, for which "'the passage of time is less significant.'"  *United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008) (citation omitted).  In this context, information that is just one or two weeks old is generally not regarded as stale.  *See*, *e.g.*, *United States v. Morrison*, 594 F.3d 626, 631 (8th Cir. 2010) (citing cases).

In sum, based on the information DiPaola obtained from a registered, reliable, confidential informant, who had worked with DiPaola for some period of time, and with other officers of the Baltimore City Police Department (*see* Defense Exhibit 2), coupled with DiPaola's corroboration of some of the information provided by the C.I., the BPD had reasonable, articulable suspicion to stop Johnson's SUV on the night of March 27, 2015.  And, as in *Singh*, 363 F.3d 347, this was not a routine traffic stop; the investigation did not concern a

traffic violation.   The police were "entitled to conduct an investigatory detention to obtain consent to search or to develop probable cause." *Id.* at 357.

In addition, the government cites *United States v. Hensley*, 469 U.S. 221 (1985), as further support for the vehicular stop.   Under *Hensley*, law enforcement may conduct a *Terry* stop based on reasonable suspicion "that a person they encounter *was* involved in or is wanted in connection with a completed felony."   *Id.* at 229 (emphasis added); *see also United States v. Quarles*, 330 F.3d 650, 653 (4th Cir. 2003).   At the time of the stop, Johnson was not wanted in connection with a completed felony.   But, there was reasonable suspicion to believe that he had engaged in felonious conduct by dealing drugs.   *Hensley* supports the stop of the SUV.

### B.  Consent to Search the SUV

### 1. The standard

An officer may not search a vehicle that is stopped unless the officer obtains consent, secures a warrant, or "develops probable cause to believe the vehicle contains evidence of criminal activity.   *Palmer*, 820 F.3d at 650; *see also United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013).   I focus next on a "jealously and carefully drawn exception to the warrant requirement[, which] recognizes the validity of searches with the voluntary consent of an individual possessing authority."   *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations and quotation marks omitted); *see Ortiz*, 669 F.3d at 445; *United States v. Neely*, 564 F.3d 346, 349-50 (4th Cir. 2009) (per curiam).

When the government justifies a warrantless search based on consent, it "bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search."   *United States v. Toyer*, 414 F. App'x 584, 588 (4th Cir. 2011) (citing *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007); *United States v. Block*, 590 F.2d 535, 539 (4th Cir.

1978)); *see also United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013).  "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. N. Carolina*, 391 U.S. 543, 548-49 (1968).  Moreover, "the Government's 'burden is heavier where consent is not explicit, since consent is not lightly to be inferred.'"  *Neely*, 564 F.3d at 350 (citation omitted).   Of relevance here, "once voluntary consent is given, it remains valid until it is withdrawn *by the defendant*."  *Ortiz*, 669 F.3d at 447 (emphasis in *Ortiz*).

Consent and the voluntariness of that consent are "related, but analytically distinct." *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) (per curiam).  Whether a defendant voluntarily consented to a search is a question of fact, which is determined by the totality of the circumstances.   *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).  The totality of the circumstances includes "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which that consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Lattimore*, 87 F.3d at 650; *see v. DiGiovanni*, 650 F.3d at 514; *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001).  In *Lattimore*, the Court said, 87 F.3d at 650:  "Whether the accused knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent . . . .";  *see Schneckloth*, 412 U.S. at 248-49.

### 2. Johnson consented to the search

DiPaola and Medeiros testified that defendant consented to the search of the SUV.

As noted, DiPaola recounted that he approached the driver's side window of the SUV and promptly advised the defendant that the police were conducting a CDS investigation.  ECF 58 at 36.  He also asked Johnson about the woman who had been seen exiting the vehicle.  *Id.* at 36.

32

In addition, DiPaola asked the defendant if there was anything illegal in the vehicle, to which Johnson responded in the negative.  *Id.* at 36.  It was then that DiPaola asked Johnson for permission to search the vehicle.  *Id.* at 36-37.  According to DiPaola, defendant immediately provided oral consent.

Officer Medeiros, who now works for a police force in Pennsylvania, corroborated DiPaola's testimony.  ECF 81 at 40-41, 59.  To be sure, Medeiros did not recall Johnson's "exact" words.  *Id.* at 59.  But, he did "remember Officer DiPaola asking for consent to search the vehicle" (*id.* at 59) and he was confident that Johnson verbally consented to the search of the SUV.  *Id.*

Later, at the police station, DiPaola obtained written consent from Johnson to search Johnson's residence.  Government Exhibit 1; ECF 58 at 48-50.  But, DiPaola did not ask Johnson to sign a consent-to-search form as to the SUV, which was searched at the scene.  ECF 58 at 92-93; *see also* ECF 84 at 21.

Johnson denies that he consented to a search of the SUV, and argues vigorously that the testimony of the two police officers as to consent was not credible.  *See*, *e.g.*, ECF 84 at 18.  To support his contention, defendant criticizes the account provided by Officer DiPaola as "unbelievably spare . . . ."  (ECF 84 at 18) and asserts that Mederios's testimony also "lacks the ring of truth."  ECF 84 at 18.  Johnson also points out that DiPaola "inexplicably failed to document Mr. Johnson's consent in any way."  ECF 84 at 20.  Moreover, Johnson faults DiPaola for failing to ask the defendant to sign a consent-to-search form at the police station, *i.e.*, *after* the search of the SUV.  In Johnson's view, it is not plausible that an officer so "concerned with reinforcing his case," so as to call for a canine unit despite obtaining consent to search the SUV, "would not also seek to create a record of the oral consent that he allegedly received so willingly

from Mr. Johnson." *Id.* at 21.   Further, the defense argues that if in fact Johnson provided consent, as the government claims, then the officers would have—and should have—conducted the search of the SUV, without waiting for the arrival of a canine unit.   ECF 84 at 21.

In my view, both police officers testified quite credibly.   Instead of weaving an elaborate yarn, DiPaola recounted the brief exchange that actually occurred.   There was not much to say because there was not much to the exchange.   And, considering that Mederios no longer works for the BPD, any motive to falsify is certainly diminished.   I see no basis to find that he perjured himself to support a former colleague's alleged fabricated account of consent.

Johnson is also incorrect in his assertion that the consent was not promptly documented. At the motion hearing, the government introduced a copy of the search and seizure warrant for the defendant's residence.   *See* Government Exhibit 2; *see also* ECF 35-2.   Given that the warrant was approved on March 27, 2015, and based on the content of the application, it is evident that the application was prepared shortly after the arrest of the defendant.   In DiPaola's recitation of facts in support of the application for the warrant, DiPaola averred, under oath, that, upon stopping the SUV, he "explained to Johnson that he was stopped in reference to a CDS investigation," and that Johnson "gave Officers consent to search his vehicle, stating that there is nothing in it." *Id.*

In addition, the defendant introduced DiPaola's Incident Report. *See* Defense Ex. 6.   In it, DiPaola stated, under oath:   "Johnson gave consent to search his vehicle and stated he didn't have anything in it."

Thus, contrary to defendant's assertion, DiPaola twice prepared nearly contemporaneous documentation of defendant's consent to the search of the SUV.

Johnson's criticism of DiPaola for his failure at the police station to seek written consent from Johnson to search his SUV, after the search had already been conducted, is tantamount to the proverbial Monday morning quarterbacking.  It was reasonable for DiPaola not to pursue written consent for a vehicle search that had already been conducted.

At oral argument, defense counsel reiterated that, if the BPD had actually obtained consent, as claimed, then there would have been no reason to call for a canine unit.  In other words, the defense sought to undermine the officers' testimony as to consent by suggesting that, if consent had been obtained, DiPaola would not have requested a drug detection dog.  I disagree.

In *Singh*, *supra*, 594 F.3d 631, the officers obtained the defendants' written consent to search their trailer.  Nevertheless, they chose instead to utilize a narcotic detection dog to examine the exterior of the trailer.  *Id.* at 357-58.  Here, DiPaola acknowledged that, although he obtained Johnson's consent to search, he called for a canine unit so that he could have "a stronger case."  ECF 58 at 99.  The fact that DiPaola obtained Johnson's consent did not bar him from requesting and preferring a canine scan.  As the government put it at oral argument, DiPaola had two constitutional options, and chose the more conservative one.

Moreover, in my view, it was the defense witnesses who were not credible.

As indicated earlier, Johnson candidly admitted that the drugs found in the SUV belonged to him.  He also indicated that, knowing he had drugs in his vehicle, he would not have agreed to a search of the SUV.  ECF 58 at 75.  However, he denied that the drugs in the SUV were for the purpose of conducting drug transactions.  *Id.* at 85.  Then, when asked to explain why the drugs were in the vehicle (*id.* at 85), he responded:  "I forgot they was in there.  I left 'um in there."  *Id.* at 86.  Thus, the defendant contradicted himself on an important point.  First, he claimed he

never would have consented to a search because the drugs were in the SUV.  Yet, he also said that he forgot that the drugs were in the SUV.

Similarly, the testimony of Jerry Brown, the passenger in the SUV, was also discredited. As discussed, Brown disputed the government's claim that Johnson consented to the search of his vehicle.  On cross-examination, Brown denied that he had ever discussed the facts of the case with the defendant.  ECF 82 at 39-40.  The government then played a portion of a recorded telephone call between the defendant and Brown while the defendant was detained.  During the call, the defendant essentially provided Brown with a script concerning the sequence of facts in the case.  The recorded jail call constituted powerful impeachment that undermined the veracity of Brown's testimony concerning consent.

In conclusion, I find that Johnson provided oral consent to search his SUV.

### 4.  The consent was voluntary

Defendant argues that any consent was involuntary because, among other reasons, Johnson was pinned in by police vehicles both in front of him and behind him, blocking his movement.  *See Robertson*, 736 F.3d at 679.    He also notes that the questioning was "immediately accusatory."  ECF 84 at 26 (citing *Robertson*, 736 F.3d at 680).  Defendant posits that he "was physically trapped, in a police dominated atmosphere, confronted with authoritative, accusatory questioning – a constellation of circumstances unambiguously communicating to Mr. Johnson that he was not free to leave or refuse Officer DiPaola's request to search his vehicle." ECF 84 at 26.

To be sure, there were several police vehicles at the scene, and the defendant's SUV was blocked by a police car in front of him and a police car behind him.  However, those facts alone do not render the consent involuntary.

Two or three of the police officers interacted with Johnson and Brown, but only DiPaola had any substantive contact with Johnson.  ECF 58 at 35-36.  By all accounts, the police officers conducted themselves in a courteous, professional, and appropriate manner, without any aggressive or threatening behavior.  No weapons were ever drawn.  No threats were made.  *See*, *e.g.*, ECF 58 at 84.  There was no indication that the defendant was physically touched by any police officer until he was handcuffed after the drugs were recovered.  The request for permission to search the SUV occurred early in the stop and so, at the time consent was obtained, the stop was not of unusually long duration.

Nor had Johnson been subjected to anything approaching extensive questioning.  In any event, a police officer may ask for identification.  *United States v. Soriano-Jarquin*, 492 F.3d 495, 500-01 (4th Cir. 2007).  And, a police officer may promptly and briefly pose questions to a suspect, related to the reason for the stop, as well as questions unrelated to the basis for the stop, "so long as those inquiries do not measurably extend the duration of the stop."  *Arizona v. Johnson*, 555 U.S. 333; *see Muehler v. Mena*, 544 U.S. 93, 100-101 (2005); *Guijon-Ortiz*, 660 F.3d at 765; *Mason*, 628 F.3d at 131.  The police may also conduct safety checks.  *Rodriguez*, 135 S. Ct. at 1615-16.

The atmosphere was not one of intimidation, beyond what is common with any traffic stop.  In this regard, I note that the stop occurred on a public street in Baltimore, not in an isolated or rural area.  It was about 8:00 p.m.  Nor was the defendant alone; his friend was with him.  Clearly, the defendant felt comfortable enough to pose questions to the officers (ECF 58 at 172, 191) and, while waiting for the canine unit to arrive, Johnson "just continued talking to [his] passenger and using [his] phone."  *Id.* at 174.  After a few minutes, he claimed he said to

DiPaola, "What's going on with y'all, auto task force?"  *Id.*   All of this suggests to me that the defendant was not overwhelmed by fear, nor was he intimidated.

It is also noteworthy that the defendant is a mature adult, over 40 years of age.   ECF 58 at 166.   In addition, this was not Johnson's first encounter with the criminal justice system.  *Id.* at 166-67. Moreover, on direct examination, Johnson was asked:  "And so you're well aware that you can – you know if [the police] ask, 'can we search your car?' you can say no?"   The defendant responded, "Yes."  *Id.* at 175.   In addition, the defendant stated that he had said no in other instances.  *Id.*

Looking at the totality of the circumstances, there is no indication from the record that the defendant's will was overcome or that the defendant merely acquiesced to a show of authority. *See Robertson*, 736 F.3d at 677-80; compare *DiGiovanni*, *supra*, 650 F.3d 498.   Although consent was obtained during the course of a police investigation, this fact alone does not render the consent involuntary.  Nor is there any evidence that consent was ever revoked by Johnson.

This case is wholly unlike *United States v. Saafir*, 754 F.3d 262 (4th Cir. 2014) (per curiam), for example.  In that case, the defendant made incriminating statements after the officer falsely asserted that he had probable cause to search the car.  *Id.* at 267.  Here, there was no misrepresentation of authority to conduct a search.  *See Bumper*, 391 U.S. at 547-50 (invalidating a defendant's consent to search her home after the officer falsely represented that he possessed a warrant).  Moreover, unlike in *DiGiovanni*, 650 F.3d at 514, there was no "false implication" to Johnson that he "was bound by his earlier consent . . ." while waiting for the arrival of the canine.  Indeed, there is no claim by Johnson that he withdrew consent.  Rather, Johnson claims he never gave consent in the first place.

For all these reasons, I conclude that the consent to search was voluntary.   Although  this determination obviates the need to resolve the issues as to the legality of the canine scan and the dog's entry into the vehicle, I do so in the alternative.

### C.      Canine Scan/Search

### 1.    The stop was not unlawfully prolonged

Johnson complains, *inter alia*, that the use of the canine was illegal because the vehicle stop was unlawfully prolonged to await the arrival of the drug dog, without any reasonable suspicion to do so.

"A dog sniff" . . . is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)) (alteration in *Rodriguez*). *See also Florida v. Jardines*, 569 U.S. 1, __, 133 S. Ct. 1409, 1416-17 (2013).  In general, a canine's scan of the exterior of a vehicle is not a search under the Fourth Amendment. *Caballes*, 543 U.S. at 410; *Edmond*, 531 U.S. at 40; *Branch*, 537 F.3d at 335.  And, a positive alert on a vehicle from a qualified drug detection dog generally provides probable cause to arrest and to search the vehicle. *Palmer*, 820 F.3d at 650; *Mason*, 628 F.3d at 130; *United States v. Kelly*, 592 F.3d 586, 592 (4th Cir. 2010); *Branch*, 537 F.3d at 340 n.2; *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994); *United States v. Sinclair*, 983 F.2d 598, 602 (4th Cir. 1993); *United States v. Wilson*, 278 F.R.D. 145, 150 (D. Md. 2011).

In *Caballes,* 543 U.S. 405, the Supreme Court indicated that a scan by a drug detection dog during a lawful traffic stop "generally does not implicate legitimate privacy interests" (*id.* at 409), and is thus permissible, without any additional justification, so long as the stop is not prolonged for the purpose of conducting the scan. *Id.*  at 407.  The Supreme Court reasoned that

a sniff from a drug detection dog "does not rise to the level of a constitutionally cognizable infringement." *Id.* at 408, 409 (emphasis in original; internal citations omitted).

However, in connection with a routine traffic stop for a driving violation, the *Rodriguez* Court said, 135 S. Ct. at 1615, that "a dog sniff is not fairly characterized as part of the officer's traffic mission." So, once the purpose of a traffic stop is completed, the police cannot extend the traffic stop to await the arrival of a canine unit, unless the extension of the stop is founded on a reasonable suspicion of other criminal activity. *Id.* In other words, in the absence of such reasonable suspicion, an extension of the stop beyond the time needed to complete the initial purpose of the stop violates the Fourth Amendment. *Id.* at 1616; *see Williams*, 808 F.3d at 246. If reasonable suspicion is developed, however, then the stop may be prolonged.[16]

*Rodriguez*, *supra*, 135 S. Ct. at 1609, made clear that a motorist who is subjected to a traffic stop cannot be detained for longer than it takes — or reasonably should take — to complete that check and to issue a citation or warning for the traffic violation that the motorist committed. *See also Royer*, 460 U.S. at 500. In this case, however, the "mission" did not concern a suspected traffic violation. Rather, it concerned suspected narcotics trafficking.

Force arrived with his handler, Detective Reid, within about ten minutes of the stop. The stop was not unlawfully prolonged to await the arrival of the canine unit. This is because the reasonable suspicion that led to the vehicular stop — suspected drug dealing by Johnson — had not been dispelled in the approximate period of ten minutes that it took for Force to arrive at the scene. In other words, the "mission" of the stop had not yet been completed. I explain below.

As noted, DiPaola thought the SUV stop occurred between 7:46 p.m. and 7:50 p.m. and "was made probably 7:50." ECF 58 at 35. He explicitly testified that he called for the canine

---

[16] The *Rodriguez* Court vacated and remanded for a determination of whether the dog sniff was "independently supported by individualized suspicion." *Rodriguez*, 135 S. Ct. at 1616.

unit "approximately 2 or 3 minutes after the vehicle stop." *Id.* at 101.   Similarly, Officer

Medeiros recalled that the request for the dog "was made pretty immediate."   ECF 81 at 43.

When Medeiros was asked if he could be more precise as to when the dog was requested,

Medeiros stated:  "A minute or two after the vehicle was stopped." *Id.* And, he estimated that it

took ten minutes for the dog to arrive once it was requested. *Id.*; *see also id.* at 45.

Detective Reid, the dog handler, testified that he received a call for the canine unit at

"around 19:55 hours, give or take."   ECF 58 at 201-202.   However, as indicated, he could not

recall how long it took him to arrive at the scene. *Id.* at 202; *see* note 9, *supra.*

A KGA recording regarding the canine request was played in open court.   It showed that

the call for the dog was made at 7:50:48 (*i.e.*, 7:50 p.m. and 48 seconds).   ECF 81 at 44.   The

canine officer, Reid, responded that he was available. *Id.* at 45.   At the conclusion of the

transmission, Reid stated:  "'Give me 5 minutes.'"   ECF 81 at 46.

The facts readily lead me to conclude that the drug detection dog was promptly requested

after the SUV was stopped, and the dog arrived at the scene in about ten minutes.   To be sure, I

cannot calculate with absolute precision the time that Force arrived.   But, I need not calculate the

exact time of Force's arrival, because it is clear that the mission of the stop was not

accomplished by the time the dog arrived.

Defendant argues that, by the time the dog arrived, police "suspicions were dispelled by

their car-side investigation" and thus the "stop should have ended."   ECF 84 at 14.   He

mistakenly relies on the view that the vehicle stop was a routine traffic stop for a driving offense.

As explained, the stop was not effected because of a suspected traffic violation, such as in

*DiGiovanni*, *Williams*, or *Rodriguez*. *See* ECF 83 at 32.   Rather, the stop was predicated on

reasonable, articulable suspicion that defendant was engaged in unlawful drug trafficking.

Reasonable suspicion was not dispelled merely because the police did not see drugs in plain view in the SUV or smell an odor of contraband.

Because the stop was not a routine traffic stop, the police were not required to obtain independent evidence of wrongdoing to justify a continuation of the stop until such time as the canine unit arrived.  As the government puts it, "the police were permitted, from the inception of the stop to its conclusion, to do whatever was reasonable and diligent to pursue a felony narcotics investigation."  ECF 85 at 9.    Calling for the canine was part of the process of confirming or dispelling reasonable suspicion that the defendant was secreting drugs in his SUV. The stop was not unlawfully extended to investigate an unrelated, additional matter, and therefore no additional grounds were needed to extend the stop for some ten minutes.

Defendant cites, *inter alia*, *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), to assert "that the officers must actually observe criminal activity, and not just have a hunch that criminal activity has occurred."  ECF 87 at 9.  According to the defendant, "the informant's information about Mr. Johnson and the woman exiting Mr. Johnson's car in a 'high crime area,' are simply not sufficient replacements for the missing key ingredient of observed criminal activity." *Id.*

In *Sprinkle*, the Fourth Circuit concluded that the police officers lacked reasonable suspicion of criminal activity so as to justify an investigative automobile stop.  *Sprinkle* involved a totality of the circumstances analysis, and the grounds for the stop were all innocuous.  For example, one suspect supposedly shielded his face from view, and the subjects were in a high crime area.  None of the circumstances included the kind of information provided here by a confidential, reliable informant, coupled with corroboration by the BPD.  *Sprinkle* is inapposite.

Under the circumstances attendant here, it was also reasonable for the police promptly to summons a canine unit, even if the defendant consented to the search of the vehicle.  The canine scan "was part of the execution of a single investigatory stop, tailored, tied to and justified by the need to confirm or dispel the reasonable suspicion of drugs."  ECF 83 at 32.  And, the police were entitled to "a reasonable period of time" to await the arrival of the canine.  ECF 85 at 8.

Although I am satisfied that the stop was not unlawfully prolonged, I reach a different conclusion as to the legality of the dog's entry into the SUV.  My reasons follow.

### 2.  Force's entry into the SUV constituted an unlawful search

A canine's scan of the exterior of a vehicle is not a search, but a scan of the interior of a vehicle "raises a different set of issues . . . because persons have reasonable expectations of privacy in the[ir car] interiors."  *United States v. Batista*, L-10-0561, 2011 WL 1636401, at *3 (D. Md. April 27, 2011) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973)).  During a traffic stop, the fact that a window of a vehicle is left open, creating an opportunity for a drug detection dog to enter the vehicle, does not necessarily render the dog's entry unlawful.  *See*, *e.g.*, *Mason*, 628 F.3d at 130; *United States v. Williams*, 609 F. Supp. 2d 829, 844-45 (D. Minn. 2010).  However, a drug dog may enter a car's interior only if he is acting instinctively and of its own accord, without facilitation, encouragement, command, or intentional action by the handler.  *United States v. Pierce*, 622 F.3d 209, 214-15 (3rd Cir. 2010) (citing cases).  Numerous cases are to like effect.  *See*, *e.g.*, *Mason*, 628 F.3d at 130; *United States v. Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009); *United States v. Lyons*, 486 F.3d 367, 370 (8th Cir. 2007); *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989); *United States v. Wilson*, 278 F.R.D. 145, 152 (D. Md. 2011); *Batista*, 2011 WL

1636401, at *4; *Williams*, 690 F. Supp. 2d at 844-45; *United States v. Curry*, L-09-0483, 2010 WL 2858009, at *4 (D. Md. July 19, 2010).

There was considerable confusion on the part of the defense as to the breed of the canine, Force, and the ability of the breed to leap into the window of an SUV. Through no fault of the defense, Johnson's expert rendered opinions based on the initial erroneous belief that Force is a German Shepherd when, in fact, he is a Belgian Malinois, with traits, characteristics, and abilities that differ from those of a German Shepherd. Thus, the testimony of the defense expert was not particularly helpful in analyzing whether Force's entry into the SUV was facilitated by Detective Reid.

I have already reviewed the testimony of Detective Reid, Force's handler, but repeat some of it for convenience. Notably, Force never alerted on the exterior of the SUV. Reid stated: "Once [Force] got to the driver's door, there was an open window. He basically went inside the vehicle, through the driver's open window, and basically started casting high at the sunroof." *Id.* at 205. According to Reid, Force "jumped through the window." *Id.* at 229. However, Reid added: "He just leaped. He just leaped into it." *Id.* at 229. Reid expressly denied that he prompted, encouraged, or directed Force to jump into the open window. *Id.* at 205. The officer reiterated, *id.* at 226: "What [Force] did is he basically, because of the window being open, he presented himself right through the window and went right to the sunroof."

Reid could not recall whether Force was on the leash at that time. ECF 58 at 203. He explained that he sometimes takes Force off the leash if he is not in an area with a lot of traffic. ECF 58 at 203. Medeiros stated that Officer Reid may have taken Force off the leash. *Id.* But, Medeiros, whose testimony I credited as to consent, also said that Reid did not attempt to stop

44

Force from entering the window.  Indeed, Medeiros testified that Reid "allowed" the canine to enter the window.  ECF 81 at 73-74.

In *Stone*, 866 F.2d 359, the defendant had opened his vehicle and "provided an opportunity for the dog to jump through the opening."  *Id.* at 1331 n.2.  The officer let go of the dog's leash.  *Id.* at 363.  Nevertheless, the Tenth Circuit found no basis to conclude that the police facilitated the dog's entry into the vehicle.  In contrast, the Tenth Circuit upheld suppression in *Winningham*, 140 F.3d 1328, where the officers opened the door to the vehicle and then unleashed the dog.  *Id.* at 1330.  The court said, *id.*:  "A desire to *facilitate* a dog sniff of the van's interior, absent in *Stone*, seems readily apparent here.[1]"  (Emphasis in *Winningham*.)

In *United States v. Lujan*, 398 Fed. App'x 347 (10th Cir. 2010), the drug detection dog was on a leash and, "without encouragement or command," the dog jumped into the vehicle. *Id.* at 349.  However, the officer was aware that on at least one prior occasion, the dog had entered a car, without instruction to do so.  *Id.* at 351.  The defendant claimed that the officer was on notice of the dog's potential to jump spontaneously into the car and thus should have taken precautions to prevent it.  *Id.*  The Tenth Circuit upheld the denial of the motion to suppress, concluding that the dog's instinctive actions did not violate the Fourth Amendment.  *Id.*

I am satisfied that Reid did not deliberately command, direct, or encourage Force to enter through the window.  Yet, under the facts of this case, I conclude that he facilitated Force's entry.  The evidence showed that Force has a very strong drive to find drugs; he has a propensity to enter an open vehicle if it contains narcotics; he had previously entered other vehicles; he was not on a leash during the scan; and there was no evidence that Force needed to be off the leash to

perform his scan.[17]   Given the dog's known characteristics and history, the canine officer should have anticipated that Force would enter the open SUV if drugs were inside, and therefore he should have kept the dog on a leash, so as to be able to restrain the dog from entering through the open window of the SUV.   *See United States v. McCoy*, 06-032 (HHK), 2007 WL 2301754 (D.D.C. Apr. 19, 2007).

Removing Force from his leash, in and of itself, might not have any legal significance if there had been no history on the dog's part of similar conduct, or if removal of the leash were necessary for Force to conduct the perimeter scan.   However, that was not the testimony.   As noted, Mederios testified that Reid "allowed" Force to enter the SUV.   ECF 81 at 73.   And, Reid testified candidly that on prior occasions Force had entered vehicles through openings.   ECF 58 at 231-32.   He stated, *id.* at 231:   "If the window's open and he picks up narcotics, he's going to go through the window."   Reid was also asked:   "And you know he has this propensity?"   Reid responded:   "Oh, absolutely."   *Id.* at 231.   Given that Force had previously entered vehicles, and was also trained as a patrol dog, not just a drug detection dog, removing Force from his leash was tantamount to facilitating his entry into the SUV.

In sum, under the facts of this case, I believe that Force's entry into the vehicle constituted an unlawful search.   Nonetheless, because the defendant voluntarily consented to the vehicle search, the unlawful entry is of no legal significance.   I shall explain.

### D.  Inevitable Discovery/Independent Source/Attenuation[18]

The exclusionary rule does not require suppression of all evidence that is illegally obtained by the police.   *Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (quoting *Segura v.*

---

[17] The burden of proof is on the government.   Given the uncertainty as to whether Force was leashed, I conclude that he was not leashed.

[18] The parties did not brief inevitable discovery, independent source, or attenuation.

*United States*, 468 U.S. 796, 815 (1984)).   As the Supreme Court recently stated in *Utah v. Strieff*, *supra*, 136 S. Ct. at 2061, there are several exceptions to the exclusionary rule that are based on "the causal relationship between the unconstitutional act and the discovery of evidence."

One of these exceptions is known as the inevitable discovery doctrine.   *See Nix v. Williams*, 467 U.S. 431, 443-444 (1984).   The "inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Strieff*, 136 S. Ct. at 2061.   In other words, the doctrine of inevitable discovery permits the introduction of evidence if it "ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444; *see United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987).   However, "the fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search itself.'"   *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (quoting *United States v. Boatwright*, 822 F.2d 862, 865 (9th Cir. 1987)).   In *Nix*, for example, a detective persuaded the defendant to reveal the location of the body of a murder victim, but in so doing violated the defendant's right to counsel. 467 U.S. at 444.   Because a comprehensive search for the victim's body was under way, the Court held suppression inappropriate because the body inevitably would have been discovered.   *Id.*   In such circumstances, "the deterrence rationale" of exclusion "has so little basis that the evidence should be received." *Id.*

Another exception is known as the independent source doctrine.   *See Murray v. United States*, 487 U.S. 533, 537 (1988).   It "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source," *Strieff*, 136 S. Ct. at 2061; *see also United States v. Bullard*, 645 F.3d 237, 244 (4th Cir. 2011).

47

The rationale of the independent source doctrine is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443.  And, when the discovery of evidence is "too attenuated" from the constitutional violation, application of the exclusionary rule is not justified.  *See Hudson*, 547 U.S. at 592-93.

The third exception is called the attenuation doctrine.  *Strieff*, 136 S. Ct. at 2061.  Under this doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance . . . ."  In that circumstance, "'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence' . . . ."  *Id.* (citation omitted).

DiPaola obtained valid consent from Johnson to search the vehicle.  But, he decided to wait for the arrival of a drug detection dog.  As indicated, the dog leaped through the open window of the SUV and alerted once inside the vehicle.  At that point, DiPaola immediately went to the sunroof of the vehicle, where he had been told by the C.I. that the cocaine was stashed.  He then removed the drugs stashed in the sunroof, consistent with what the C.I. had told him.

DiPaola testified that he did not need a drug dog, because he had Johnson's consent to search.  But, he thought the dog would make his case stronger.  ECF 58 at 82.  He also said that he would have executed the search of the sunroof himself if the dog had not arrived, because he had obtained consent from Johnson.  *Id.*  at 39-40.

Even without the dog's involvement at the scene, DiPaola inevitably would have discovered the drugs in the sunroof of Johnson's SUV. In effect, the consent provided an independent source. Moreover, given Johnson's knowing and voluntary consent, no interest would be served by suppression of the drugs.

### E. *Miranda*[19]

The Fifth Amendment provides, in part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 444, 467-68, 471 (1966), the Supreme Court determined that, when an individual is subjected to custodial interrogation, procedural safeguards are required. In particular, the Supreme Court held that members of law enforcement must inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. An individual interrogated while in police custody "'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444).

Statements obtained from a defendant during custodial interrogation are inadmissible in the government's case-in-chief, unless the government can demonstrate that law enforcement officers adequately informed the defendant of his *Miranda* rights and obtained a knowing and voluntary waiver of those rights. *See Miranda*, 384 U.S. at 476-479; *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010); *Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984); *United States v. Cardwell*, 433 F.3d 378, 389 (4th Cir. 2005). As the Supreme Court explained

---

[19] The parties did nto address the issue of defendant's statements. I shall do so briefly.

in *Moran v. Burbine*, 475 U.S. at 421, the waiver inquiry has "two distinct dimensions":  the waiver must be "voluntary," *i.e.*, "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must be made knowingly, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moreover, the government bears the burden of proving a knowing and voluntary waiver.  *See, e.g., Berghuis*, 560 U.S. at 383; *Moran*, 475 U.S. at 421; *Cardwell*, 433 F.3d at 389-90; *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002).   Absent *Miranda* warnings and a voluntary waiver, statements made during custodial interrogation are generally inadmissible.  *United States v. Hargrove*, 625 F.3d 170, 177 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 292 (2011).

"The four warnings *Miranda* requires are invariable. . . ."  *Florida v. Powell*, 559 U.S. 50, 60 (2010).  And, the Fourth Circuit "has rejected attempts to add additional warnings to the time-tested *Miranda* formulation."  *United States v. Clenney*, 631 F.3d 658, 668 (4th Cir. 2011); *see Harris v. Riddle*, 551 F.2d 936, 938-39 (4th Cir. 1977).   Nevertheless, there is no precise formulation of the warnings needed to satisfy *Miranda's* "'strictures.'"  *Berghuis*, 560 U.S. at 385.  Moreover, a waiver of rights may be oral or written, implied or express.  *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 982 (2013); *Cardwell*, 433 F.3d at 389.  A court may "infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'"  *Berghuis*, 560 U.S. at 387 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

A reasonable person in the defendant's position would have understood that he was "in custody" at the scene once the drugs were found in the SUV.  At that time, he was handcuffed and arrested.  But, the record shows the requisite warnings and waiver.  The defendant was orally

advised of his rights at the scene and readvised at the police station.  Both times, he indicated he

understood this rights, and he knowingly made a statement concerning his possession of a

firearm at his residence.

The test to determine whether a statement was voluntary "is whether the defendant's will

has been 'overborne' or his 'capacity for self determination critically impaired.'"  *United States*

*v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth*, 412 U.S. at 225); *see also*

*Dickerson*, 530 U.S. at 434; *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *United States v.*

*Gray*, 137 F.3d 765, 771 (4th Cir. 1998).  As the *Cristobal* Court explained, 293 F.3d at 140,

"[c]oercive police activity is a necessary predicate to a finding that a confession is not

'voluntary' within the meaning of the Due Process Clause. . . ."  *See also Colorado v. Connelly*,

479 U.S. at 167.

In deciding whether a defendant's will has been overborne, or his capacity for self

determination critically impaired, courts look to the totality of the circumstances.  This, in turn,

requires consideration of the particular characteristics of the defendant, the circumstances of the

interview, and the details of the interrogation.  *Cristobal*, 293 F.3d at 140 (citing *Pelton*, 835 at

1071).  In applying these general principles to various factual scenarios, the Fourth Circuit has

considered factors such as: (1) whether law enforcement officers properly advised the suspect of

his right not to make any statements and of his right to the presence of an attorney; (2) whether

the officers inappropriately told the suspect that he was legally obligated to speak with them; (3)

whether the officers physically or verbally threatened the suspect; (4) whether the suspect

appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that

his statements could not be used against him; and (6) whether the officers engaged in any violent

behavior during their questioning.  *See generally Gray*, 137 F.3d at 771; *United States v. Braxton*, 112 F.3d 777, 781-85 (4th Cir. 1997) (en banc).

Coercion has been found where the suspect was subjected to severe physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936); held incommunicado and questioned for over 36 hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944); given "truth serums," *see Townsend v. Sain*, 372 U.S. 293 (1963); or threatened with a loaded gun while wounded, *see Beecher v. Alabama,* 389 U.S. 35 (1967).

Johnson was not threatened, coerced, mistreated, tricked, or intimidated.  He was not under the influence of any substance that impaired his ability to understand his rights.  He did not suffer from a mental impairment.  DiPaola was courteous.  And, Johnson is a mature adult who has previous experience with the criminal justice system.  His waiver was voluntary.

### F.  Search of Defendant's Apartment[20]

The Fourth Amendment to the Constitution guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  It also states that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized."

The Warrant Clause requires an affidavit supporting a request for a search warrant to show some factual basis for the belief that the suspect occupies or is otherwise connected to the targeted premises and that contraband or evidence will be found in that particular place.  This is known as the particularity requirement.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United*

---

[20] The parties did not address the defendant's consent to search his home or the search warrant.  I need not discuss the validity of the consent because, even assuming that defendant's consent to search his apartment is invalid, the police had probable cause to obtain a search warrant for defendant's residence.

*States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013); *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012); *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011).   "'[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.'"   *United States v. Sowards,* 690 F.3d 583, 588 (4th Cir. 2012) (quoting *Wilson v. Arkansas,* 514 U.S. 922, 931) (1995)) (alteration in *Sowards*).

In this case, Officer DiPaola applied for a search and seizure warrant.  In his Affidavit, Government Exhibit 2, he recounted that a reliable confidential informant had provided him with information as to the defendant, including his residence, and, in particular, he averred that the C.I. "stated that Craig is selling 'Rock Cocaine' from his apartment and his vehicle."  ECF 35-2 at 10.  Moreover, he recounted that the C.I. drove DiPaola to the parking lot of the defendant's residence and told DiPaola that the defendant keeps drugs in the sunroof of his vehicle.  *Id.* at 11. The police officer also recounted that he saw defendant's vehicle leaving the location of 3013 Thorndale Apartment 6, and that he saw Johnson enter the vehicle.

The Affidavit also includes information pertinent to the vehicle stop, when Force entered the defendant's vehicle through an open window.  But, the Affidavit also indicates that Johnson consented to the search of the SUV.  Drugs were recovered from the vehicle.  On the scene, after the drugs were recovered and Johnson was advised of his *Miranda* rights, Johnson was asked if he had any drugs or firearms at his apartment and, according to the Affidavit, Johnson advised that he had a firearm in a closet in his bedroom.  *Id.*

"Probable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'"   *Ortiz*, 669 F.3d at 444 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  The "standard" of "'reasonable ground for belief of guilt' requires less of a showing than does the formal preponderance-of-the evidence standard."  *Ortiz*,

669 F.3d at 444-45 (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Indeed, such "[f]inely-tuned standards . . . useful in formal trials, have no place in the magistrate's decision."  *Gates*, 462 U.S. at 235.

To determine whether a warrant application is supported by probable cause, a judicial officer must make "a practical, commonsense decision, whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238.  Here, a judge of the District Court of Maryland for Baltimore City reviewed the search and seizure warrant and properly made that commonsense determination.

### III.    Conclusion

For the reasons set forth above, I shall DENY defendant's Motion.  An Order follows.


Date:   September 2, 2016                                        /s/
                                                       Ellen L. Hollander
                                                       United States District Judge